# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| Felicia Stanfield, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | Civil Action No. 2:22-cv-207 |
| | § | |
| Kia America, Inc. and | § | |
| Kia Corporation, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S COMPLAINT

**To the Honorable Judge of Said Court:**

COMES NOW, Felicia Stanfield (hereinafter referred to as "Plaintiff"), and respectfully files this Complaint against Kia America, Inc. and Kia Corporation (hereinafter referred to collectively as "Kia"), and in support hereof would state and show the following:

### I. Parties

1.    Plaintiff Felicia Stanfield is the biological mother of Decedent, Devon Tariq Stanfield.

2.    Defendant, Kia America, Inc., is a foreign corporation at all times doing business in Texas, and service of process upon this Defendant may be had by serving its

registered agent for process: CT Corporation System at 350 N. St. Paul Street, Dallas, Texas 75201.

3.     Defendant Kia Corporation is a foreign corporation at all times doing business in Texas, and service of process upon this Defendant may be had by serving: President, Noi-Myung Kim at: 231231, Yangjae-Dong, Seocho-Ku, Seoul, 137-928, Republic of Korea.

## II. Jurisdiction

4.     This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

5.     The parties to this lawsuit are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

6.     Kia Corporation is a multi-national, multi-billion-dollar corporation that designs, develops, manufactures, assembles, markets and sells automobiles, and related component and replacement parts in Asia, Europe, North America, and internationally. North America is Kia's biggest market.

7.     Kia Corporation began selling its vehicles and powertrains in the United States in 1992.

8.     Kia Corporation's products include cars and motor vehicles, automobile engines, transmissions, and press parts. These products are distributed throughout North America, including the United States, and including Texas.

9.    For years up until the present date, Kia Corporation has been aware/is aware that thousands upon thousands of its vehicles and other products were (and are) arriving in Texas through the stream of commerce and being sold in Texas.

10.   Indeed, for years, Kia Corporation was (and is) aware that thousands upon thousands of its vehicles and other products were (and are) arriving in Texas through other states.

11.   Furthermore, Kia Corporation is aware that it has end users of its vehicles and other products located in Texas.

12.   Kia America, Inc. is the distributor for Kia Corporation vehicles and other products. Kia Corporation is aware of the distribution system's operation, and Kia Corporation knows that it benefits economically from the sale in Texas of Kia Corporation vehicles and other products.

13.   Kia Corporation could, if it wanted to, instruct Kia America, Inc. to refuse to ship vehicles and other products to Texas. However, Kia Corporation, has never, in any way, shape, or form, restricted the Subject Vehicle model which caused the fatal injuries complained of herein from being distributed, sold, or used in Texas, nor has Kia Corporation, ever, in any way, shape, or form, restricted any of its vehicles or products that it designs, manufactures, or distributes from being distributed, sold, or used in Texas.

14.   Thus, it is clear that Kia Corporation's vehicles and other products arrive in Texas either through direct shipment or through the stream of commerce and that Kia Corporation is aware of this fact.

15.   Kia Corporation also knows that there are consumers who are looking for Kia Corporation vehicles and other products in Texas, and Kia Corporation helps them buy vehicles and other products in Texas by providing them with information about their vehicles and products.

16.   Kia Corporation spends at least hundreds of thousands, if not millions, of dollars per year marketing its products, including the Subject Vehicle. Indeed, for many years up until the present, Kia Corporation has made, approved, and/or distributed advertisements or commercials or other marketing materials touting the safety of Kia Corporation vehicles and how much Kia Corporation supposedly cares about safety.

17.   Advertisements and marketing materials were and are targeted to United States consumers, including Texas residents, to entice them to purchase Kia Corporation vehicles, including the model of the Subject Vehicle.

18.   Kia Corporation made, approved, and/or distributed these types of materials to entice consumers and ultimate users, including those in Texas, to (1) purchase Kia Corporation vehicles—whether used or new; (2) to drive Kia Corporation vehicles—whether used or new; and (3) to ride in Kia Corporation vehicles—whether used or new.

19.   Kia Corporation knew that American consumers—including consumers in Texas—would rely upon its statements when deciding whether to purchase a Kia Corporation vehicle, whether to drive a Kia Corporation vehicle, or whether to ride in a Kia Corporation vehicle.

20.   On the Subject Vehicle, Kia Corporation affixed a sticker wherein Kia Corporation affirmatively represented to consumers that, "This vehicle conforms to all applicable federal motor vehicle safety and theft prevention standards in effect on the date of manufacture."

21.   Based upon information and/or belief, the Subject Vehicle did not meet all Federal Motor Vehicle Safety Standards (FMVSS).

22.   Kia Corporation is currently in exclusive possession and control of all the technical materials and other documents/material regarding the design, development, manufacture, assembly, engineering analysis, and testing of the Subject Vehicle.  In the past, Plaintiff's counsel has worked on several other vehicle product liability lawsuits in Texas and elsewhere against Kia Corporation, and counsel have seen Kia Corporation confidential documents and learned other information regarding Kia Corporation and its vehicles.

23.   In those other cases, Kia Corporation took the position that all the technical materials and other documents/material regarding the design, development, manufacture, assembly, engineering analysis, and testing of the subject vehicle were confidential and/or proprietary, and Kia Corporation insisted that it would not produce such materials without a protective order, which would contain language that counsel had to either return the material or destroy the material at the conclusion of litigation.

24.   Based upon information and/or belief obtained from those other cases, employees, officers and/or directors of Kia Corporation have visited, lived, conducted business, and/or worked in Texas.

25.   Based upon information and/or belief obtained from those other cases, Kia Corporation also monitors its vehicles, such as looking at customer complaints or feedback from distributors and dealers, including many in Texas.

26.   Based upon information and/or belief obtained from those other cases, Kia Corporation has, in the past, entered into contracts with other individuals or entities located in the State of Texas, and/or where performance of the contract was to take place in the State of Texas.

27.   Based upon information and/or belief obtained from those other cases, Kia Corporation keeps records of the revenue that it derives from the State of Texas.

28.   Kia Corporation holds patents and trademarks which it demands must be honored in Texas.

29.   Kia Corporation provides a warranty for certain Kia vehicles, including vehicles in Texas, and Kia Corporation will reimburse Kia America, Inc. for warranty costs.

30.   Kia Corporation routinely corresponds and works with the National Highway Traffic Safety Administration (NHTSA) on recalls and other issues, including recalls or fixes to problems for vehicles owned and used by Texas residents.

31.   Kia Corporation has appeared in other litigation—including product liability litigation involving its vehicles—in Texas and not contested personal jurisdiction, both in Texas state court and federal court.

32.   Kia Corporation designs, manufactures, tests, assembles, sells, distributes, and places Kia Corporation model vehicles and their component parts into the stream of commerce, such as the Subject Vehicle involved in the incident made the basis of this suit.

33.   Kia Corporation placed the Subject Vehicle into the stream of commerce where it ultimately ended up in Texas.

34.   Kia Corporation knew that once it placed the vehicle into the stream of commerce, that there was a likelihood the car would wind up in Texas and/or be driven on Texas roads where it might be involved in an accident.

35.   The key elements of the episode-in-suit occurred in Texas.

36.   Kia Corporation has purposefully availed itself in Texas, and due process and fair play and substantial justice are honored by this civil action going forward in this Texas Court.

37.    There is little or no burden on Kia Corporation litigating this case in this Texas Court. In contrast, it would be a tremendous burden and great inefficiency and unnecessary delay imposed on the Plaintiff to litigate this case in another forum because Texas has an interest in overseeing this litigation which involves injuries to Texas residents and defective products used in Texas.

38.   The efficient resolution of this civil action can only go forward in this Texas Court, and public policy favors resolution of this dispute in this Texas Court.

39.   Kia Corporation cannot deny personal jurisdiction because Kia Corporation placed the Subject Vehicle into the stream of commerce under circumstances such that Kia Corporation should reasonably anticipate being haled into court in Texas, where it has been many times before.

40.   Kia Corporation cannot deny personal jurisdiction because Kia Corporation placed the Subject Vehicle into the stream of commerce knowing full well that the Subject Vehicle—as well as hundreds if not thousands of other vehicles of the exact same model—could very well ultimately wind up in Texas and be driven by Texas residents on Texas roads, and that said vehicle(s) might be involved in an accident in Texas which might injure occupants of the vehicle.

41.   In short, Kia Corporation is in the business of the manufacture of vehicles, including the vehicle which caused the fatal injuries complained of herein. Kia Corporation also derives substantial profit from the state of Texas.

42.   Kia Corporation, in no way, shape, or form ever restricted the Subject Vehicle, which caused the fatal injuries, from being distributed, sold, or used in Texas. Kia Corporation has purposefully availed itself of the privilege and benefits of conducting activities within Texas.

43.   Accordingly, Kia Corporation is therefore subject to be sued in Texas courts, and the exercise of personal jurisdiction pursuant to Texas's long arm statute is,

among other things, consistent with due process because Kia Corporation has purposefully availed itself of the privilege of doing business in the forum.

## III. Facts

44.   On or about March 30, 2021, Devon Tariq Stanfield was driving a 2016 Kia Optima (VIN: 5XXGW4L27GG073344) ("Subject Vehicle").

45.   The Subject Vehicle was stopped eastbound on US Highway 80 preparing to make a left turn when another vehicle struck the Subject Vehicle in the rear.

46.   The rear strike caused the Subject Vehicle to be pushed into westbound lanes of US Highway 80 where the Subject Vehicle was then struck on the right passenger side by another vehicle.

47.   The Subject Vehicle was designed by one or more of the Kia Defendants.

48.   The Subject Vehicle was manufactured by one or more of the Kia Defendants.

49.   The Subject Vehicle was marketed by one or more of the Kia Defendants.

50.   The Subject Vehicle was also assembled by one or more of the Kia Defendants.

51.   Despite being properly seated and properly wearing the available seat belt, Devon Tariq Stanfield sustained fatal injuries when the Subject Vehicle failed to protect him because it violated several crashworthiness principles.

## IV. Crashworthiness Overview

52.   Crashworthiness is the science of preventing or minimizing injuries or death following an accident through the use of a vehicle's various safety systems.[1]

53.   There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

1.   Maintain survival space;

2.   Provide proper restraint throughout the entire accident;

3.   Prevent ejection;

4.   Distribute and channel energy; and

5.   Prevent post-crash fires.

54.   When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

55.   The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from

---

[1] In any crashworthiness case, the distinction between the cause of an accident versus the cause of injuries is an important one. One of the best analogies is the case of the Titanic. While the cause of hitting the iceberg has been the subject of much debate (inattentiveness, the captain may have been drinking, they were going too fast, etc.), there is no question that every passenger which entered a lifeboat that night lived, while 99% of those who went in the water died. Accordingly, had the Titanic had enough lifeboats on board (i.e., the boat's "safety systems"), 100% of the people on-board would probably have lived. So, the cause of the sinking (the accident) is irrelevant vis-à-vis how everyone died. What's important is how the safety systems worked (or didn't work) following the accident.

crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

56.   Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

## V. Duty to Make a Safe Vehicle

57.   For decades, automobile manufacturers have been telling the general public and others how important it is to make safe vehicles.

58.   For instance, in 1993, General Motors stated that "Safety isn't one thing. It's everything." Mary Barra, CEO of General Motors, testified to Congress in 2014 that, "Our customers and their safety are at the center of everything we do." Jeff Boyer, Vice-President of Global Vehicle Safety at General Motors, has stated that "Nothing is more important than the safety of our customers in the vehicles they drive."

59.   General Motors has also stated in the past that, "The rich don't deserve to be safer … Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

60.   Ford has stated in the past that it is so obsessed with safety that only a person's mother is more obsessed with that person's safety than Ford.

61.   Ford has testified under oath that Ford "has a moral obligation to do those things that are feasible and practical to reduce the risk of injury and death to customers."

62.   Honda believes that safety is for everyone, including for other vehicle occupants and for pedestrians.



63.   In 2012, Volvo stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

64.   Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle." Gerald Greenwald, chairman of Chrysler, then sent a letter to every Chrysler dealership in 1988 stating that Chrysler intended to honor that right.

65.   Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and

find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle.

66.   Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

67.   It is further incumbent upon auto manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle design, testing, and reverse engineering of other manufacturers' vehicles.

68.   In fact, insofar as society permits vehicle manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle will not be harmful to buyers, their households, or third parties.

69.   This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

## VI. Kia and Safety

70.   For decades, Kia has noted that it has a corporate culture that respects human beings.

71.   Kia has bragged that their cars are getting smarter and safer.

72.  Kia has touted that their vehicles utilize safety features as standard equipment that other luxury cars include as options because at Kia, "safety is never an option."

73.   Kia has stated that in designing and testing their vehicles, there's nothing Kia considers more important than safety.

74.  Kia has stated that it strives to achieve crashworthiness results that far exceeds those required by law.

75.  Kia has said that no one can predict a collision occurring, but you can trust a Kia vehicle to protect you should the unforeseen happen.

76.  Kia has further stated that Kia works tirelessly to ensure that every safety system on its vehicles is designed to help people handle the unexpected.

## VII. Cause(s) of Action as to Kia Defendants

### A. Count One: Strict Liability and Defective Design/Manufacture/Failure to Warn

77.  Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

78.  Kia Defendants (referred to in this Section simply as "Defendants") are in the business of designing, manufacturing, testing, assembling, marketing and/or distributing vehicles, including the Subject Vehicle.

79.  Defendants designed, manufactured, tested, assembled, marketed, and/or sold the Subject Vehicle that caused the fatal injuries to Devon Tariq Stanfield and Plaintiff's damages.

80.   The Subject Vehicle was defective and unreasonably dangerous for its in-tended use.

81.   The Subject Vehicle was defective at the time it left Defendants' control.

82.   Reasonable consumers would not have been aware of the defective condition of the Subject Vehicle.

83.   Decedent, Devon Tariq Stanfield, and Plaintiff were not aware of the defects in the Subject Vehicle.

84.   The fatal injuries to Devon Tariq Stanfield complained of herein occurred be-cause the Subject Vehicle was defective and unreasonably dangerous.

85.   As detailed herein, the Subject Vehicle contains multiple design defects, De-fendants have committed multiple acts of engineering negligence and they have cre-ated false, misleading and/or deceptive marketing intended to lure consumers.

86.   The Subject Vehicle was defective and unreasonably dangerous, the Defend-ants were strictly liable, negligent and Defendants misrepresented the safety of the Subject Vehicle in the following, non-exhaustive list of ways:

   a.   The Subject Vehicle violates principles of crashworthiness;
   b.   The Subject Vehicle failed to provide proper restraint through-out the entire accident;
   c.   The Subject Vehicle failed to provide a center mounted airbag that would prevent the occupant from striking the vehicle inte-rior;
   d.   The Subject Vehicle failed to provide a center mounted airbag that would prevent the far side occupant from rolling out of their seatbelt;
   e.   The Subject Vehicle failed to contain a center mounted airbag that would prevent the far side occupant from striking intruding structure due to the belt rollout;

f.    The Subject Vehicle failed to contain seat belt rollout counter-measures for far side impacts;

g.    Other vehicles have had center mounted airbags for years beginning in the 2013 production cycle for certain GM vehicles;

h.    The Subject Vehicle was not properly tested;

i.    The Subject Vehicle was not subjected to rigorous engineering analysis;

j.    Defendants failed to conduct FEM and FEA analysis with rollout countermeasures in place;

k.    Defendants failed to provide proper restraint because the far side occupant was permitted to rollout;

l.    Defendants bragged about how they were concerned about occupant safety, that their vehicles were state of the art, that their testing and engineering analysis rivaled any manufacturer in the world, and that their vehicles were safer in comparison to other peer group vehicles;

m.    The statements by Defendants were meant to entice, encourage, and promote the sale of their vehicles;

n.    The marketing statements were false and misleading;

o.    Defendants likewise failed to conduct proper testing and engineering analysis;

p.    The Subject Vehicle violated consumer expectations;

q.    Defendants bragged about the safety of their vehicles;

r.    Defendants bragged about the state of the art and technological advancements of their vehicles;

s.    Defendants bragged about being an industry leader in vehicle safety;

t.    Defendants made material misrepresentations that were not accurate or were false and Decedent, Devon Tariq Stanfield, and Plaintiff relied upon these representations;

u.    Defendants have said that building safe vehicles is the most important thing they do;

v.    Defendants have said that automobile safety is the foundation of their automobile manufacturing;

w.    Defendants have said that they have built a storehouse of safety technology since their first vehicle was built;

x.    Defendants have said that safety is one of their foremost concerns;

y.   Defendants have said that passive safety engineering means to ensure occupant survival with the least injuries in as many accident situations as possible;

z.   Defendants have said that safety is always on our mind;

aa.  Defendants have said that they are fully aware of their responsibility to produce vehicles with the best overall safety possible;

bb.  Defendants have said that they work hard to stay at the cutting edge of technology;

cc.  Defendants have said that they believe that safety is fundamental for making vehicles;

dd.  Defendants have said that they always work to improve by putting forth new ideas and making the best of their abilities;

ee.  Defendants have said that they believe that everyone deserves to be safe;

ff.  Defendants have touted that no matter who you are and what you drive, everyone deserves to be safe;

gg.  Defendants have stated that safety is of paramount importance;

hh.  Defendants have stated that everything we do is to ensure occupant safety;

ii.  Defendants have stated that everyone deserves a safe vehicle;

jj.  Defendants violated principles of consumer expectation by giving consumers a false sense of security and a false sense of safety; and

kk.  The defects, negligence, misrepresentations, and/or violations of consumer expectations were the direct, producing, proximate, and/or substantial cause of the fatal injuries to the Decedent, Devon Tariq Stanfield, and Plaintiff's damages.

**B. Count Two: Negligence**

87.   Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

88.   In addition to and/or in the alternative to the product liability claims asserted herein, Defendants were negligent in the design, manufacture, testing, assembly, marketing, and/or distribution of the Subject Vehicle.

89. Companies that are in the business of designing, testing, manufacturing, marketing, distributing and selling products are never allowed to needlessly endanger consumers.

90. Defendants owed a duty to use reasonable care in the design, manufacture, testing, assembly, marketing and/or distribution of the Subject Vehicle.

91. Defendants failed to use reasonable care when they designed, manufactured, tested, assembled, marketed, distributed and/or sold the Subject Vehicle, and consequently put a product on the market that was unreasonably dangerous for its intended or reasonably anticipated use as discussed herein.

92. In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards and/or dangers that can lead to serious injury or death.

93. Once potential risks, hazards, and/or dangers identified, then the potential risks, hazards, or dangers should be eliminated if possible.

94. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

95. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

96. A company is negligent where the company fails to conduct a proper engineering analysis that would help it to identify potential risk, hazards, and/or dangers that could seriously injure someone.

97. As noted earlier, most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon

of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public."

98.   Accordingly, since paramount means "superior to all others", all vehicle engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles. Indeed, General Motors, for instance, has admitted under oath that its engineers have to hold paramount the safety, health, and welfare of the public, and/or dangers that can lead to serious injury or death.

99.   With respect to the Subject Vehicle, based upon information and/or belief, the Subject Vehicle was not subjected to rigorous engineering analysis.

100. With respect to the Subject Vehicle, based upon information and/or belief, the Subject Vehicle was not properly tested and analyzed to determine what counter-measures were needed to prevent occupant rollout in far side impacts.

101. Based upon information and/or belief, Defendants either knew or should have known about advanced safety features used in Europe, Australia, Japan or foreign markets and chose not to offer those safety features to American consumers.

102. Defendants' safety philosophy and design philosophy are utilized in various model vehicles and parts, including ones sold in foreign markets.

103. When Defendants designed the Subject Vehicle, Defendants did not reinvent the wheel. Defendants used (or should have used) an enormous amount of human capital which had been acquired from numerous different engineers who had worked

on many prior vehicles. This knowledge would have been (or should have been) utilized in different aspects of the designs of the vehicle to make the Subject Vehicle safer in foreseeable accidents such as what occurred in this case.

104. Defendants are currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the Subject Vehicle. Defendants are also in possession of what, if any, engineering analysis was performed.

105. However, it is expected that after all these materials are produced in discovery and/or after Defendants' employees and corporate representatives have been deposed, additional allegations may come to light.

106. Lastly, the materials from other models, years, and foreign markets will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

107. The foregoing acts and/or omissions, defects, misrepresentations and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the fatal injuries to Decedent, Devon Tariq Stanfield, and Plaintiff's damages.

### C. Count Three: Misrepresentation

108. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

109. Defendants have misrepresented that safety must come first.

110. Defendants have misrepresented that it has an obligation to protect vehicle occupants in the best way possible should the worst-case scenario arise.

111. Specifically, for decades Kia has touted the safety of its vehicles.

112. The Subject Vehicle failed to possess all of the state-of-the-art safety equipment qualities that the Defendants have touted for decades.

113. The foregoing acts and/or omissions, defects, and/or negligence of Defendants were the producing, direct, proximate, and/or legal cause of the fatal injuries to the Decedent, Devon Tariq Stanfield, and Plaintiff's damages.

## VIII. Damages to Plaintiff

114. As a result of the acts and/or omissions of one or more of the Defendants, Plaintiff has suffered: mental anguish, emotional distress, loss of companionship, loss of consortium, and hedonic damages in the past and in all likelihood into the future as a result of the death to her son.

115. As a result of the acts and/or omissions of one or more of the Defendants, Plaintiff has become obligated to pay reasonable and necessary funeral and burial expenses as a result of the death to her son.

116. As a result of the acts and/or omissions of one or more of the Defendants, Plaintiff has suffered all damages allowed under the Wrongful Death statute and case law in Texas over the loss of a biological decedent.

117. The above and foregoing acts and/or omissions of one or more of the Defendants, resulting in the fatal injuries to Devon Tariq Stanfield, Plaintiff's biological son, have caused actual damages to Plaintiff.

## VI. Prayer

118. For the reasons presented herein, Plaintiff prays that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recovers judgment against one or more of the Defendants for:

   a.  actual damages;
   b.  prejudgment and post-judgment interest beginning March 30, 2021;
   c.  costs of suit; and
   d.  all other relief, general and special, to which Plaintiff is entitled to at law and/or in equity, and/or which the Court deems proper.

Respectfully submitted,

**The TRACY firm**


  /s E. Todd Tracy
E. Todd Tracy (Attorney-in-Charge)
State Bar No. 20178650
TTracy@vehiclesafetyfirm.com
Wendell P. Martens, Jr.
State Bar No. 24002528
CMartens@vehiclesafetyfirm.com
Garrett D. Rogers
State Bar No. 24110295
Grogers@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas 75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiff**